## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 29 2018, 10:24 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of:
N.C. *(Minor Child)*

and

T.C. *(Father)*,

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner,*

and

May 29, 2018

Court of Appeals Case No.
49A02-1712-JT-2846

Appeal from the Marion Superior Court

The Honorable Marilyn Moores, Judge

The Honorable Larry Bradley, Magistrate

Trial Court Cause No.
49D09-1612-JT-1202

Child Advocates, Inc.,

*Guardian Ad Litem.*

**Robb, Judge.**

# Case Summary and Issue

[1]     T.C. ("Father") appeals the juvenile court's termination of his parental rights to N.C. ("Child"), raising two issues for our review which we consolidate and rephrase as whether the juvenile court's termination order is supported by clear and convincing evidence. Concluding the termination order is not clearly erroneous, we affirm.

# Facts and Procedural History

[2]     Father and T.B. ("Mother")[1] are the parents of Child, who was born October 7, 2014. Three months later, on January 16, 2015, the Indiana Department of Child Services ("DCS") filed a petition alleging Child was a child in need of services ("CHINS") because Mother had tested positive for various drugs at

---

[1] Mother's parental rights were involuntarily terminated prior to Father's and Mother is not a party to this appeal.

Child's birth. Child remained in the care of Mother and Father until Father was arrested on March 20, 2015, and charged with dealing in methamphetamine, a Level 2 felony, possession of methamphetamine, a Level 4 felony, and alleged to be an habitual offender.

[3] At the fact finding hearing on June 23, 2015, Mother and Father stipulated Child was a CHINS for various reasons, and the juvenile court so adjudicated Child. After a hearing, the juvenile court entered a dispositional decree ordering Father to complete a parenting assessment, submit random drug and alcohol screenings, adhere to the terms of his probation, maintain legal employment and safe housing, and attend all scheduled visitations with Child.

[4] On October 19, 2015, Father pleaded guilty to dealing in methamphetamine, a Level 2 felony, and admitted being an habitual offender. Father was sentenced to eighteen years, eight of which was to be executed at the Indiana Department of Correction and the remaining ten years suspended to probation. Father's criminal record also includes convictions of dealing in cocaine, a Class B felony; robbery, a Class C felony; and domestic battery, a Class A misdemeanor. Father's conviction for domestic battery related to an incident involving Mother while she was pregnant with Child.

[5] Father remains incarcerated where his earliest possible release date is September 17, 2020, absent programs that reduce his sentence. However, Father has completed a ten-month "CLIFF Program," encompassing classes addressing cognitive thinking, substance abuse, the 12-step program, and life

skills, as well as a 90-day program entitled "Inside Out Dads," focusing on parenting and healthy relationships with children. Due to the completion of these programs, along with a job assistance training program which was set to end in April 2018, Father may be eligible for release as early as December 2018.

[6] On August 28, 2015, Child was placed with P.L. ("Foster Mother"), in whose care she has remained throughout these proceedings. Child was placed in foster care along with her half-sister, Mother's child from a previous relationship,[2] and was less than six months old when she had her last in-person contact with Father. Child has since been diagnosed with epilepsy and receives medication along with speech therapy and home-based therapy for behavioral issues. Since his incarceration, Father's only contact with Child has been facilitated by Foster Mother, consisting of one video recording and the gift of several coloring books.

[7] After Father failed to comply with obligations of the dispositional order, DCS recommended, and the juvenile court agreed, to change Child's permanency plan from reunification to adoption. Then, on December 4, 2016, DCS filed its termination petition and the juvenile court conducted a trial on November 16, 2017. In terminating Father's parental rights, the juvenile court found, in relevant part:

> 23. There is a reasonable probability that the conditions that resulted in [Child's] removal and continued placement outside

---

[2] Father has five additional children, with ages ranging from three to twenty-two, all of whom reside with their mothers.

the home will not be remedied by [Father]. [Father's] release from incarceration was not imminent at the time of trial, and his past criminal activity gives rise to doubting [sic] whether he can remain outside of incarceration and available to parent.

24. There is a reasonable probability that the continuation of the parent-child relationship poses a threat to [Child's] well-being in that it would pose as a barrier to obtaining permanency for her with the only family she knows and with whom she is bonded.

25. [Child's] Guardian ad Litem recommends adoption due to her safe and stable long term home, and concerns over the lack of bond [Child] would have with [Father].

26. Termination of the parent-child relationship is in the best interests of [Child]. Termination would allow her to be adopted into a stable and permanent home with her sister, and allow her needs to continue to be met.

27. There exists a satisfactory plan for the future care and treatment of [Child], that being adoption into the only home she knows.

Appealed Order at 2. This appeal ensued.

# Discussion and Decision

## I. Standard of Review

Reviewing a termination of parental rights, we neither weigh the evidence nor judge witness credibility and we consider only the evidence and reasonable inferences most favorable to the judgment. *In re C.G.*, 954 N.E.2d 910, 923

(Ind. 2011). We apply a two-tiered standard of review in reviewing the juvenile court's findings of fact and conclusions thereon: first we determine whether the evidence supports the findings and then determine whether the findings support the judgment. *Id*. "We will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. Clear error is that which leaves us with a definite and firm conviction that a mistake has been made." *S.L. v. Ind. Dep't of Child Servs.*, 997 N.E.2d 1114, 1123 (Ind. Ct. App. 2013) (citation omitted).

## II. Termination Order

[9] Father contends the juvenile court's termination order is clearly erroneous. Specifically, Father claims the State failed to present clear and convincing evidence to establish: (1) a reasonable probability that the conditions resulting in Child's removal will not be remedied; (2) a reasonable probability the continuation of the parent-child relationship poses a threat to Child's well-being; and (3) that termination of Father's parental rights is in the best interests of Child. We disagree.

[10] "[T]he relationship between a parent and child is one of the most valued within our culture." *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015). "However, these parental interests are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Matter of M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. A termination of parental rights is "an extreme measure

that is designed to be used as a last resort when all other reasonable efforts have failed . . . ." *In re K.W.*, 12 N.E.3d 241, 249 (Ind. 2014).

[11] Indiana Code section 31-35-2-4(b)(2) provides the statutory requirements in order to terminate parental rights. This section provides, in relevant part, that the State must prove:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child[; and]
>
> * * *
>
> (C) that termination is in the best interests of the child . . . .

[12] Notably, the provisions of Indiana Code section 31-35-2-4(b)(2)(B) are written in the disjunctive, and thus the State need only prove one of those statutory elements, *In re L.S.*, 717 N.E.2d 204, 209 (Ind. Ct. App. 1999), *trans. denied, cert. denied*, 534 U.S. 1161 (2002), but must do so by clear and convincing evidence, Ind. Code § 31-34-12-2; *In re G.Y.*, 904 N.E.2d 1257, 1261 (Ind. 2009). If a juvenile court determines the allegations of the petition are true, then the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

# A. Remedy of Conditions

Father first alleges the juvenile court erred when it concluded there is a reasonable probability that the conditions resulting in Child's removal will not be remedied. The juvenile court concluded:

> 23. There is a reasonable probability that the conditions that resulted in [Child's] removal and continued placement outside the home will not be remedied by [Father]. [Father's] release from incarceration was not imminent at the time of trial, and his past criminal activity gives rise to doubting [sic] whether he can remain outside of incarceration and available to parent.

Appealed Order at 2.

*In K.T.K. v. Ind. Dep't. of Child Services*, our supreme court explained:

> We engage in a two-step analysis to determine whether the conditions that led to the [Child's] placement outside the home will not be remedied. First, we must ascertain what conditions led to [the] placement and retention in foster care. Second, we determine whether there is a reasonable probability that those conditions will not be remedied. In making these decisions, the trial court must consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation.

989 N.E.2d 1225, 1231 (Ind. 2013) (quotations and citations omitted). Considerations of the court may properly include "evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *A.F. v. Marion Cty.*

*Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied.*

[15] Here, Child was initially removed from Father's care due to his drug-related arrest and subsequent incarceration. In arguing the State failed to meet its burden to prove this condition will not be remedied, Father claims the juvenile court's finding that Father's release was "not imminent" is "incorrect," and that the court erroneously relied upon his incarceration to terminate his parental rights. Brief of the Appellant at 15. Although we conclude that Father's release was imminent, we nevertheless conclude the juvenile court's determination was not clearly erroneous.

[16] Turning first to whether Father's release was imminent, Father testified that his "earliest possible release date is September the 17th of 2020," but due to his participation in several programs—at least one of which was yet to be completed—his release could be as soon as "December of 2018 according to my Abstract of Judgment." Transcript, Volume II at 120. In *In re G.Y.*, our supreme court noted that a mother's release from prison was "imminent" where she had as few as sixteen months left of incarceration. 904 N.E.2d at 1265. Here too, we view Father's release from incarceration in as few as thirteen months as imminent and we must disregard the juvenile court's erroneous finding to the contrary. *In re B.J.*, 879 N.E.2d 7, 19 (Ind. Ct. App. 2008), *trans. denied.* However, given Father's remaining criminal history and the juvenile court's accurate findings, such error was harmless. *See id.* (affirming termination of parental rights despite erroneous finding based on testimony stricken from

the record because the error did not "constitute the sole support for any conclusion of law necessary to sustain the judgment"); *Matter of A.C.B.*, 598 N.E.2d 570, 573 (Ind. Ct. App. 1992) (affirming termination of parental rights despite erroneous findings because error was "not of such magnitude that it calls into question the court's conclusion" that termination was in child's best interests).

[17] Contrary to Father's assertion, his incarceration was not the only factor underlying the termination petition. Father's pattern of criminal behavior was also a primary factor, given his most recent convictions of dealing in methamphetamine and domestic battery, as well as prior convictions of dealing in cocaine and robbery. As we oft note, "[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*. Although the conduct for which Father is currently incarcerated occurred before Child's birth, that fact is of little significance considering Father has five older children and Father's conviction for domestic battery related to an incident while Mother was pregnant with Child. In turn, Father emphasizes his testimony that he is done with his former "lifestyle" and that he wants a new life and opportunity to parent Child, suggesting that he "has undergone a dramatic transformation." Br. of Appellant at 19. This, however, is merely an invitation to reweigh the evidence and we must decline. *In re C.G.*, 954 N.E.2d at 923. Accordingly, we conclude that the juvenile court's finding that Father's "past criminal activity

gives rise to doubting [sic] whether [Father] can remain outside of incarceration and available to parent," Appealed Order at 2, is supported by the record.

[18] Next, Father argues that "Indiana courts routinely have preserved the parental rights of an incarcerated offender when the parent will be released within two years and has shown during his incarceration both desire and effort to change and improve his parenting," citing *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641 (Ind. 2015), *In re J.M.*, 908 N.E.2d 191 (Ind. 2009); *In re G.Y.*, 904 N.E.2d 1257 (Ind. 2009); and *In re M.W.*, 943 N.E.2d 848 (Ind. Ct. App. 2011), in support thereof. Br. of Appellant at 20. Although these cases possess similarities with that now before us, we find them distinguishable for two primary reasons.

[19] The first, as discussed above, is Father's criminal history and pattern of conduct. And the second reason, as the State argues, is the fact that Father has had little relationship with Child. The record reveals that Father is essentially a stranger to Child: he was only present for Child's first six months and has only maintained minimal contact despite Foster Mother's willingness to facilitate their relationship. *Cf. K.E.*, 39 N.E.3d at 644 (noting that Father makes "nightly phone calls . . . to talk to both of his children"); *In re J.M.*, 908 N.E.2d at 195 (finding that both mother and father "had a relationship with the child prior [to] their imprisonment"); *In re G.Y.*, 904 N.E.2d at 1258, 1264 (Ind. 2009) (child lived with mother for twenty months and the "record shows that since her incarceration Mother has maintained a consistent, positive relationship with

[child]"); and *In re M.W.*, 943 N.E.2d at 855 (noting that father "was bonded with [child]").

[20] The record also reveals that Father failed to contact DCS or adhere to the terms of the dispositional order. Aside from the provisions of the dispositional order which Father's incarceration prevented him from completing, Father failed to so much as contact DCS, despite being provided the relevant information. Therefore, although we acknowledge—and certainly commend—Father's participation in several worthwhile programs while incarcerated, considering Father's criminal history, the absence of a meaningful relationship with Child, and our deference to the juvenile court in such matters, we cannot say the juvenile court clearly erred in concluding the evidence shows a reasonable probability the conditions resulting in Child's removal will not be remedied.[3]

## B. Best Interests

[21] Father also argues that the juvenile court erroneously concluded that termination of Father's parental rights is in Child's best interest. The juvenile court concluded:

> 26. Termination of the parent-child relationship is in the best interests of [Child]. Termination would allow her to be adopted

---

[3] Father also argues the juvenile court erred in finding his continued custody poses a threat to the Child's well-being. However, as noted above, Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive and requires only one element be proven to terminate Father's parental rights. *See In re I.A.*, 903 N.E.2d 146, 153 (Ind. Ct. App. 2009). Having concluded the evidence is sufficient to show a reasonable probability the conditions resulting in Child's removal will not be remedied, we need not consider whether the parent-child relationship poses a threat to Child's well-being.

into a stable and permanent home with her sister, and allow her needs to continue to be met.

Appealed Order at 2.

[22] In determining the best interests of a child, the juvenile court must "look beyond the factors identified by the DCS and look to the totality of the evidence." *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App. 2009). Recommendations of the case manager, court-appointed advocate, and evidence tending to show that the conditions resulting in removal will not be remedied is sufficient to show termination is in the child's best interests by clear and convincing evidence. *See, e.g., In re A.I.,* 825 N.E.2d 798, 811 (Ind. Ct. App. 2005), *trans. denied.* Here, both the family case manager and the guardian ad litem opined that termination of Father's parental rights was in Child's best interest.

[23] Moreover, permanency is a central consideration in determining the best interests of a child. *In re G.Y.*, 904 N.E.2d at 1265-66. And, while we are mindful that the right of parents to raise their child should not be terminated "solely because there is a better home available for the child," *In re V.A.*, 51 N.E.3d 1140, 1152 (Ind. 2016), as evidenced by our discussion above, that is not the case before us. Here, Child has been outside the care of Father for all but the first six months of her life and it is uncontested that Child is doing exceedingly well in foster placement. Child is receiving treatment for a serious health condition and responding positively to both speech and behavioral therapy. The evidence establishes a significant bond between Child and Foster

Mother, and Foster Mother is also adopting Child's half-sister, about whom Foster Mother testified, "they would be lost without each other." Tr., Vol. II at 82. Accordingly, the juvenile court did not err in its determination of Child's best interests.

# Conclusion

[24] Concluding the juvenile court's decision to terminate Father's parental rights was not clearly erroneous, we affirm.

[25] Affirmed.

Najam, J., and Altice, J., concur.